[No. B037779. Second Dist., Div. Seven. Nov. 16, 1989.]

ALEXANDER A. MUNRO, a Minor, etc., et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Defendants and Respondents.

978

**COUNSEL**

Harney, Drummond, Garza & Packer, Harney & Packer and Thomas Kallay for Plaintiffs and Appellants.

Patterson, Ritner, Lockwood, Zanghi & Gartner, Robert Scholl, Greines, Martin, Stein & Richland, Martin Stein and Barbara W. Ravitz for Defendants and Respondents.

**OPINION**

**LILLIE, P. J.**—Alexander Munro, a minor by and through his guardians ad litem Pamela and Allen Munro, and Pamela and Allen Munro, individually, sued the Regents of the University of California, doing business as UCLA Medical Center, and Barbara Crandall for medical malpractice and intentional and negligent infliction of emotional distress. Plaintiffs appeal from summary judgment entered against them and in favor of defendants.

### FACTS

Plaintiffs Pamela and Allen Munro are a married couple. In September 1984 Mrs. Munro saw Dr. William Growdon, an obstetrician-gynecologist. Dr. Growdon confirmed that Mrs. Munro, then 37 years old, was pregnant with her second child. Because of the increased risk of Down's Syndrome in children born to women over the age of 35, Dr. Growdon referred Mrs. Munro to defendant Barbara Crandall, a physician, for genetic counseling.

In October 1984 Mrs. Munro met with Dr. Crandall at the UCLA Neuropsychiatric Institute. At this meeting Dr. Crandall took a family history of Mr. and Mrs. Munro. Mrs. Munro told Dr. Crandall her father's background was "primarily German" and her mother's background was English and Canadian. She said that her husband's father's father was Scottish and his father's mother was either Scottish or Irish. Mrs. Munro also told Dr. Crandall that Mr. Munro's mother's father was Norwegian and his

"mother's father's [*sic*] family was some peculiar type of French." The information Dr. Crandall obtained from Mrs. Munro indicated that neither she nor Mr. Munro is of Jewish heritage. Because of the extremely low incidence of non-Jewish carriers of Tay-Sachs disease, Dr. Crandall does not recommend genetic testing for Tay-Sachs disease unless one or both parents indicate they are of Ashkenazic (eastern European) Jewish background.[1] Accordingly, when Mrs. Munro underwent genetic testing at UCLA Medical Center in November 1984, no test was given to determine whether she or her husband had the genetic makeup for transmission of Tay-Sachs disease to their unborn child. About three weeks later an employee of the UCLA Medical Center telephoned Mrs. Munro and told her she was carrying a healthy baby boy.

On May 11, 1985, Pamela Munro gave birth to plaintiff Alexander Munro. In March 1986 Alexander was diagnosed as suffering from Tay-Sachs disease. When Mrs. Munro came to her for genetic counseling in 1984, Dr. Crandall knew that in addition to Ashkenazic Jews, there is a small inbred community in French Canada which is said to have a slightly higher prevalence of Tay-Sachs disease than the general population. Not until after the counseling session did the Munros learn that Mr. Munro's maternal grandfather's parents were French Canadian.

Plaintiffs sued defendants for medical malpractice and intentional and negligent infliction of emotional distress. The complaint's first cause of action ("negligence"), on behalf of all plaintiffs, alleged that plaintiff Alexander Munro, by his guardians ad litem plaintiffs Pamela and Allen Munro, engaged the services of defendants to care for and treat "a problem pertaining to the health and well-being" of Alexander Munro and Pamela Munro. Defendants undertook to provide genetic counseling for Pamela Munro, and consequently for Alexander Munro. In providing such counseling defendants negligently failed to possess and exercise the degree of knowledge and skill ordinarily possessed and exercised by other physicians and hospitals in the same locality as defendants. As a direct result of said negligence plaintiffs Pamela Munro and Allen Munro suffered severe, serious and permanent physical and emotional injuries. Plaintiff Alexander Munro, by and through his guardians ad litem, incurred hospital and medical expenses and will continue to incur such expenses for an indefinite period of time in the future.

---

[1] Tay-Sachs disease is a recessively transmitted genetic disorder, i.e.: Each parent has one normal gene and one recessive Tay-Sachs gene, a child born with Tay-Sachs disease having received one recessive gene from each parent. A victim of Tay-Sachs disease suffers from an untreatable progressive degeneration of the central nervous system which generally results in death in early childhood.

The second cause of action (intentional infliction of emotional distress), on behalf of plaintiffs Pamela and Allen Munro, incorporated the allegations of the first cause of action and further alleged: When she received genetic counseling from defendants, Pamela Munro was pregnant with Alexander and sought the services of defendants for the purpose of diagnosis and treatment of any genetic fetal abnormality. Defendants held themselves out to the general public, including plaintiffs, as experts in the field of genetic counseling and diagnosis; plaintiffs had no education or training in that field and relied upon defendants to undertake all necessary and proper testing so as to render a professional opinion regarding potential genetic disorders in Alexander. Defendants represented to plaintiffs that all such testing would be done. Plaintiffs believed that tests to rule out Tay-Sachs disease were performed by defendants and that said tests were negative. In fact, defendants intentionally and maliciously either omitted said tests or if said tests were performed, recklessly disregarded their results and failed to inform plaintiffs Pamela and Allen Munro that Alexander, in utero, was afflicted with Tay-Sachs disease. As a result of defendants' conduct plaintiffs suffered severe emotional distress.[2]

Defendants moved for summary judgment on the ground defendant Barbara Crandall acted within the operative standard of care in her genetic counseling of plaintiffs. In support of the motion defendants presented excerpts from the depositions of Dr. Crandall and plaintiffs Pamela and Allen Munro. Defendants also presented the declaration of Dr. Michael Kaback, a physician certified by the American Board of Pediatrics and the American Board of Medical Genetics. Dr. Kaback is the director of the State of California Tay-Sachs Disease Prevention Program and the director of the International Tay-Sachs Disease Testing, Quality Control and Data Collection Center. Based on his medical knowledge and expertise and his knowledge of the facts of this case,[3] Dr. Kaback expressed the opinion that plaintiffs did not meet the profile characteristics necessary to warrant performing a Tay-Sachs screening test and therefore it was within the standard of care for defendants not to perform such testing on plaintiffs.

Plaintiffs opposed the motion for summary judgment, submitting the declaration of plaintiff Pamela Munro wherein she stated inter alia: If the basis of defendants' exclusion of Tay-Sachs testing was the fact that she and

---

[2] The third cause of action (negligent infliction of emotional distress), on behalf of plaintiffs Pamela and Allen Munro, incorporated all of the allegations of the two preceding causes of action. The third cause of action adds nothing to the second cause of action and we therefore ignore it.

[3] Dr. Kaback reviewed the medical records of Pamela Munro and Alexander Munro and the depositions of Dr. Crandall, Pamela Munro and Allen Munro. In addition, Dr. Kaback was a *treating physician* of Alexander Munro subsequent to his birth and had numerous conversations with Pamela and Allen Munro concerning Alexander.

her husband are not Jewish, this should have been made known to plaintiffs; regardless of the rarity of the carrier status of Tay-Sachs disease in non-Jews, plaintiffs would have availed themselves of the Tay-Sachs test if the easy availability of that test had been made known to them. Plaintiffs presented no expert medical evidence.[4]

The motion was granted as to the entire complaint. Summary judgment was entered in favor of defendants and against plaintiffs. This appeal followed.

## DISCUSSION

## I

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) ■ A defendant moving for summary judgment must either negate a necessary element of the plaintiff's case or establish a complete defense. (*Fireman's Fund Ins. Co.* v. *Fibreboard Corp.* (1986) 182 Cal.App.3d 462, 465 [227 Cal.Rptr. 203].) ■ "Under well established rules governing summary judgment motions, the affidavits of the moving party are to be strictly construed and those of his opponent liberally construed. [Citations.] Nevertheless, a party opposing a motion for summary judgment which is supported by affidavits or declarations sufficient to sustain the motion, has the burden of showing that triable issues of fact exist." (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].) If the opposing party does not sustain that burden summary judgment is proper. (*Saatzer* v. *Smith* (1981) 122 Cal.App.3d 512, 517 [176 Cal.Rptr. 68].)

## II

■ Plaintiffs' first cause of action alleged medical malpractice. ■ The standard of care in a medical malpractice case requires that physicians exercise in diagnosis and treatment that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the

---

[4] After the trial court gave plaintiffs an opportunity to produce such evidence, plaintiffs presented the declaration of their attorney quoting an article (attached to the declaration) by a Dr. Edwin Kolodny wherein he advocated that "all couples of child-bearing potential" should be given the Tay-Sachs carrier test if, among other circumstances, "one or both spouses are French-Canadian." Defendants objected to the article on the ground it is inadmissible hearsay evidence. (Evid. Code, § 1200.) The trial court refused to consider the article on that ground. Plaintiffs do not challenge the court's ruling.

medical profession under similar circumstances. (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 36 [210 Cal.Rptr. 762, 694 P.2d 1134]; *Landeros* v. *Flood* (1976) 17 Cal.3d 399, 408 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324].) " 'The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman.' [Citations.]" (*Landeros* v. *Flood, supra,* 17 Cal.3d at p. 410.) ▪ The circumstances under which genetic testing for Tay-Sachs disease is indicated, are beyond a layman's knowledge. Accordingly, expert testimony was required in order to determine whether defendants' alleged failure to administer such genetic testing to plaintiffs met the standard of care imposed on physicians.

Recognizing this, defendants submitted expert evidence in the form of Dr. Kaback's declaration wherein he stated: Since it is medically impossible to screen all patients for all known genetic abnormalities, the standard of care requires that specific screening tests be performed only on those patients who meet specific profile characteristics that warrant such tests. Because individuals of Jewish heritage have a much higher incidence of carrying the gene which causes Tay-Sachs disease than is found in the general population, they have been targeted for screening for Tay-Sachs disease; on the other hand, since the incidence of Tay-Sachs in the non-Jewish population is statistically so low, screening of that population for Tay-Sachs never has been advocated. The information which defendants obtained from plaintiffs disclosed that neither Pamela Munro nor Allen Munro is of Jewish heritage. While it was known that certain rare and isolated groups other than those of Ashkenazic Jewish heritage did have a statistically increased chance of Tay-Sachs over the general population, review of the depositions of plaintiffs and Dr. Crandall shows that, at the time plaintiffs received genetic counseling from defendants, plaintiffs were unaware of any information concerning their genetic background which would have placed them in one of those groups. Based on the foregoing facts it was Dr. Kaback's opinion that plaintiffs did not meet the profile characteristics necessary to warrant performing a Tay-Sachs carrier screening test and therefore it was within the standard of care for defendants not to perform such testing on plaintiffs.

As previously noted, plaintiffs failed to submit the declaration of an expert in opposition to the motion for summary judgment. Accordingly, no triable issue of fact was presented regarding defendants' compliance with the relevant medical standard of care and summary judgment on plaintiffs' cause of action for medical malpractice must be affirmed. "California courts

have incorporated the expert evidence requirement into their standard for summary judgment in medical malpractice cases. When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence." (*Hutchinson* v. *United States* (9th Cir. 1988) 838 F.2d 390, 392, citing *Willard* v. *Hagemeister* (1981) 121 Cal.App.3d 406, 412 [175 Cal.Rptr. 365].)

## III

■ Plaintiffs contend that defendants had a duty to disclose material information to enable plaintiffs to make an informed decision whether to take the Tay-Sachs test. Plaintiffs further argue that because such duty of disclosure is not governed by the standard practice of the physicians' community, but is instead a duty imposed by law (*Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 243 [104 Cal.Rptr. 505, 502 P.2d 1]; *Berkey* v. *Anderson* (1969) 1 Cal.App.3d 790, 805 [82 Cal.Rptr. 67]), expert evidence is not required to establish the existence of the duty (*ibid.*) and a triable issue of fact was presented as to whether defendants complied with that duty.

Defendants reply that inasmuch as plaintiffs did not allege breach of the duty of disclosure, they may not advance that theory on appeal. ■ "Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments. [Citation.] An argument or theory will generally not be considered if it is raised for the first time on appeal. [Citation.] Specifically, in reviewing a summary judgment, the appellate court must consider only those facts before the trial court, disregarding any new allegations on appeal. [Citation.] Thus, possible theories that were not fully developed or factually presented to the trial court cannot create a 'triable issue' on appeal." (*American Continental Ins. Co.* v. *C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1281 [241 Cal.Rptr. 466].)

■ Plaintiffs' second cause of action, while labeled "intentional infliction of emotional distress," appears to allege fraud on the part of defendants by falsely representing to plaintiffs that testing for all "potential genetic disorders" would be done. In her declaration in opposition to the motion for summary judgment plaintiff Pamela Munro stated: During genetic counseling by defendants, plaintiff was not told why she was asked questions about her family history and that of her husband. If defendants' exclusion of Tay-Sachs testing was based on the fact that plaintiffs are not Jewish, defendants should have so informed plaintiff. They also should have told her of the easy availability of Tay-Sachs screening. If plaintiffs had

known this, they would have availed themselves of such screening regardless of the rarity of the Tay-Sachs trait in non-Jewish people.

In *Willard* v. *Hagemeister, supra,* 121 Cal.App.3d 406, a dental malpractice case in which summary judgment was entered in favor of defendants, plaintiff alleged that she consented to certain dental treatment on the basis of false representations that such treatment would save a tooth. The court concluded that in addition to fraud, plaintiff attempted to charge defendants with a failure to disclose material facts necessary for an informed consent to their proposed treatment. The court noted that the requisite causal relationship between defendants' failure to inform and plaintiff's injury was supplied by plaintiff's counterdeclaration that if the inherent risks had been revealed, she would not have consented to the treatment given. Summary judgment for defendants on the cause of action for fraud was reversed with directions that plaintiff be permitted to amend her complaint and to litigate the issue of informed consent. (*Willard, supra,* 121 Cal.App.3d at pp. 418-419.)

We decline to follow a similar course because, under the circumstances of the present case, as a matter of law plaintiffs cannot prevail on the theory of lack of informed consent.

In *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, the Supreme Court held that "as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (P. 243.) In *Truman* v. *Thomas* (1980) 27 Cal.3d 285 [165 Cal.Rptr. 308, 611 P.2d 902], it was held the duty of disclosure applies whether the proposed procedure involves treatment or a diagnostic test. (P. 292.) Further, a patient must be informed of the risks of refusing to undergo a proposed treatment or test as well as the risks of consenting to proposed treatment or testing. (*Ibid.*)

In *Scalere* v. *Stenson* (1989) 211 Cal.App.3d 1446 [260 Cal.Rptr. 152], we recently held that under *Cobbs* and *Truman* a physician has no duty to disclose where no diagnostic testing or treatment is recommended. There, plaintiff underwent a diagnostic surgical procedure (angiogram) performed on the brachial artery of her right arm. After surgery plaintiff complained of pain in her right arm. Defendant, a cardiologist, examined and tested the arm and concluded it was progressing satisfactorily. He therefore neither told plaintiff about nor recommended any further diagnostic tests or therapy. A year later plaintiff underwent a saphenous vein bypass of her right brachial artery with resultant damage. While plaintiff alleged only ordinary negligence ("'negligently examined, diagnosed, prognosed, cared for,

treated, and performed surgical procedures upon the body and person of plaintiff ") (211 Cal.App.3d at p. 1449), at trial she relied on the theory that defendant improperly failed to disclose material facts necessary for plaintiff to evaluate her condition and seek post-operative care. In affirming judgment in favor of defendant we rejected that theory, noting that in *Cobbs* the predicate for the duty to disclose was proposed therapy (duodenal ulcer surgery) while in *Truman* the predicate for the duty was a proposed diagnostic procedure (pap smear). We concluded that inasmuch as defendant, following the surgery, recommended neither further therapy nor further diagnostic testing, no duty of disclosure arose. (*Scalere, supra,* 211 Cal.App.3d at pp. 1449-1450.)

In rejecting the contrary view expressed by the dissent, we stated: "The dissent would draw a new duty-to-disclose line. Though a doctor proposes neither surgery nor medical procedure, though he recommends no therapy and is unaware of any other school of doctors who would recommend therapy, the dissent would require such a doctor to disclose 'the risks and benefits of non-treatment.' [¶] Such a line, like one drawn with a finger in the air, is without precision and predictability. It would impose significant new burdens on already harried doctors without awarding demonstrable benefits to their patients. [¶] 'It seems obviously prohibitive and unrealistic to expect physicians to discuss with their patients every risk of proposed treatment [[l]et alone *non*treatment (fn. 7, original italics)]—no matter how small or remote—and generally unnecessary from the patient's viewpoint as well.' [Citation.]" (*Scalere* v. *Stenson, supra,* 211 Cal.App.3d at p. 1453.)

The passage quoted in *Scalere* is a complete answer to plaintiffs' argument that even though defendants did not recommend plaintiffs undergo a Tay-Sachs screening test, defendants were under a duty to inform plaintiffs of the incidence of Tay-Sachs disease in the general population, the higher incidence of the disease among French Canadians, and that the Tay-Sachs test is simply a blood test which, together with the amniocentetic culture test therefor, costs $500.[5] As is natural in view of their son's tragic affliction, plaintiffs focus on defendants' failure to give them any information which would have enabled them to decide whether or not to undergo testing for Tay-Sachs disease. However, when Pamela Munro received genetic counseling she provided defendants with no facts which should have alerted them to the possibility that one or both of the plaintiffs might be carriers of Tay-Sachs disease, which is but one of approximately 70 genetic disorders that can be detected by testing. This is

---

[5] The duty of disclosure is not based on the lack of burden on a physician in disclosing information, as plaintiffs seem to imply. Rather, the duty is based on a patient's need for information in determining whether to undergo treatment or testing proposed by the physician. (See *Truman* v. *Thomas, supra,* 27 Cal.3d 285, 291.)

truly a case in which it can be said that the information plaintiffs now claim defendants were under a duty to divulge related to a " 'small or remote' " risk[6] (*Scalere, supra,* 211 Cal.App.3d at p. 1453) and was " 'generally unnecessary from the patient's viewpoint' " (*ibid.*) in light of what plaintiffs knew of their respective ethnic backgrounds at the time of genetic counseling.

Plaintiffs would have us impose on defendants a duty to give plaintiffs information regarding a genetic test defendants did not recommend because it was not indicated by any facts which plaintiffs told to defendants, or even any facts of which plaintiffs were aware. Reason, as well as precedent, compels our refusal to impose such a duty.

## IV

In an attempt to bring this case within the principle that a duty to disclose arises where treatment or diagnostic testing is proposed, as distinguished from the situation where no treatment or testing is proposed (*Scalere* v. *Stenson, supra,* 211 Cal.App.3d 1446, 1449-1451; *Jamison* v. *Lindsa*y (1980) 108 Cal.App.3d 223, 230 [166 Cal.Rptr. 443]), plaintiffs contend defendants performed a Tay-Sachs screening test on plaintiffs by asking them whether they are Jewish. Under plaintiffs' newly conceived theory, summary judgment was improper because it is a triable issue of fact whether plaintiff Pamela Munro was given sufficient information to make an informed decision about undergoing further diagnostic testing following the initial test which took place when she was asked whether she or her husband is Jewish.

Plaintiffs' complaint alleged that defendants omitted tests to rule out Tay-Sachs disease. Nothing in plaintiffs' opposition to the motion for summary judgment indicated that they claimed defendants in fact performed such tests by asking questions about plaintiffs' ethnic background, or by any other means. Plaintiffs therefore run afoul of the rule that a party may not, for the first time on appeal, change the theory of the cause of action and may not raise on appeal issues not raised in the trial court. (*Estate of Westerman* (1968) 68 Cal.2d 267, 279 [66 Cal.Rptr. 29 [437 P.2d 517].) Plaintiffs note that an exception to the rule exists where the new theory presents a strict question of law and is based on the pleadings and declarations before the trial court and contained in the record on appeal. (*Garcia* v. *Los Angeles Unified School Dist.* (1985) 173 Cal.App.3d 701, 709 [219 Cal.Rptr. 544].) They argue that under this exception they are entitled to

---

[6] In her deposition Dr. Crandall testified that the incidence of non-Jewish carriers of Tay-Sachs disease is between 1 in 200 and 1 in 300, which Dr. Crandall, in her professional opinion, considered an "exceedingly low" incidence.

raise the issue whether testing for Tay-Sachs was performed by asking plaintiffs whether they are Jewish. We do not agree.

■ The rule which forbids raising a new issue for the first time on appeal takes on added significance in summary judgment proceedings because "[t]he moving party's burden on a motion for summary judgment is only to 'negate the existence of triable issues of fact in a fashion that [entitles] it to judgment on the issues raised by the pleadings. [Citation.] It [is] not required to refute liability on some theoretical possibility not included in the pleadings.' [Citation.]" (*American Continental Ins. Co.* v. *C & Z Timber Co., supra,* 195 Cal.App.3d 1271, 1281.) Accordingly, it would be unfair to a party who successfully moved for summary judgment to permit the opposing party on appeal to raise a new theory not included in the pleadings.

The gravamen of plaintiffs' second cause of action was that defendants administered no genetic testing for Tay-Sachs to plaintiffs. Understandably, therefore, defendants' showing in support of their motion for summary judgment did not include evidence to refute the contention plaintiffs now make that asking whether plaintiffs are Jewish amounted to testing them for Tay-Sachs disease. Inasmuch as defendants did not have the opportunity to challenge that contention factually, plaintiffs' new legal theory " 'contemplates a factual situation the consequences of which . . . were not put in issue' " at the summary judgment proceeding. (*Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].) Such a theory may not be advanced for the first time on appeal. (*Rickel* v. *Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 656 [192 Cal.Rptr. 732].)

### DISPOSITION

The judgment is affirmed.

Woods (Fred), J., concurred.

**JOHNSON, J.,** Concurring and Dissenting.—I concur in the result the majority reaches but not in its reasoning.

For the reasons I explained at length in my dissent in *Scalere* v. *Stenson* (1989) 211 Cal.App.3d 1446, 1454 [260 Cal.Rptr. 152], a doctor's duty of disclosure includes the duty of explaining the risks and benefits of nontreatment. (*Id.* at p. 1455.) This duty arises from the same principle that imposes a duty to explain the risks and benefits of treatment: "so that patients might meaningfully exercise their right to make decisions about their own bodies. . . ." (*Truman* v. *Thomas* (1980) 27 Cal.3d 285, 292 [165 Cal.Rptr.

308, 611 P.2d 902].) Whether the physician's recommendation is to treat or not to treat, or, as here, to test or not to test, there are risks and benefits to either course which must be explained to the patient.

The principle that a doctor's duty of disclosure includes the duty of explaining the risks of not performing tests has been recognized in other jurisdictions. For example, in *Goldberg by and through Goldberg* v. *Ruskin* (1984) 128 Ill.App.3d 1029 [471 N.E.2d 530, 537], *affd. on appeal from a separate issue* (Ill. 1986) 499 N.E.2d 406, 407, the court held the parents stated a cause of action for wrongful birth against their obstetrician after their child was born with Tay-Sachs disease. The basis of the Goldbergs' action, like the Munros', was the defendant's failure to administer any tests for Tay-Sachs or to inform the Goldbergs of the possible occurrence of the disease and the existence of tests for it. In upholding the complaint, the court stated: "Mr. and Mrs. Goldberg have alleged the existence of a duty on the part of the defendants to inform them of the risk of Tay-Sachs disease and of the availability of a testing procedure for the disease and that the breach of that duty was the proximate cause of the birth of [their impaired son.] . . . Assuming these factual allegations of the parents to be true . . . 'it can be said in traditional tort language that but for the defendants' breach of their duty to advise plaintiffs, the latter would not have been required to assume these obligations [of raising an impaired child.]' " (Citation omitted.) In *Phillips* v. *United States* (D.C.S.C. 1981) 566 F.Supp. 1, 3, 13, applying South Carolina law, defendants were held liable in a wrongful birth action for failing to explain to the mother the advisability of an amniocentesis.

In the present case, the majority clings to its view, expressed in *Scalere,* that patient care is a one-sided coin. The duty of disclosure applies when the physician proposes to perform a test but "a physician has no duty to disclose where no diagnostic testing or treatment is recommended." (*Ante,* at p. 986.) According to the majority, imposing a duty to disclose the risks and benefits of not performing a test would be like drawing a line with a finger in the air; it would be without precision and predictability. (*Ante,* at p. 987.) A comparison of *Goldberg, Phillips* and *Scalere* to the case before us demonstrates such a line can be successfully drawn.

Whether the physician's proposed course is to test or not to test, "[t]he scope of the physician's duty to disclose is measured by the amount of knowledge a patient needs in order to make an informed choice. All information material to the patient's decision should be given . . . .[¶] Material information is that which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position . . . ." (*Truman* v. *Thomas, supra,* 27 Cal.3d at p. 291.)

In *Scalere,* the evidence showed: (1) Dr. Stenson suspected the existence of a blood clot two days after Ms. Scalere's surgery; (2) if a blood clot exists it is advisable to perform a thrombectomy soon after the angiogram; (3) a thrombectomy for a patient exhibiting Ms. Scalere's symptoms was a reasonable option. Even if Dr. Stenson only suspected the existence of a blood clot that suspicion was enough to trigger a duty to disclose the possibility of a blood clot and the risks and benefits of treatment versus nontreatment. A jury could have properly found the foregoing information "would have been regarded as significant by a reasonable person" in Ms. Scalere's position and that Dr. Stenson breached his duty of care in failing to disclose it. Similarly, in *Goldberg by and through Goldberg* v. *Ruskin, supra,* 499 N.E.2d 406, defendant failed to administer a test for Tay-Sachs and did not even inform the parents of the existence of such a test despite the obvious fact Mr. Goldberg, at least, was Jewish. And, in *Phillips,* defendants failed to advise the mother of the availability of prenatal testing procedures, particularly amniocentesis, despite their knowledge the mother's sister suffered from Down's syndrome.

In contrast to *Scalere, Goldberg* and *Phillips,* nothing Dr. Crandall knew about the Munros triggered a duty to disclose the risks and benefits of not testing for Tay-Sachs. Neither of the Munros was of Jewish heritage. Mr. Munro had some distant relatives of French heritage but Dr. Crandall had no reason to know or even suspect any of these relatives came from a small inbred community of French Canadians which is said to have a slightly higher incidence of Tay-Sachs disease than the general population.

In the present case, summary judgment against the Munros should be affirmed because the undisputed facts show Dr. Crandall was not aware of any facts that would trigger a duty to disclose to the Munros the risk of not performing a test for Tay-Sachs. Thus, the majority reaches the correct result in this case. What concerns me is the majority would have reached the same result in the case of the Goldbergs and the Phillips.

Appellants' petition for review by the Supreme Court was denied February 15, 1990.